NOV 12 2014

**ORIGINAL**

Approved: _____
DANIEL B. TEHRANI
Assistant United States Attorney

Before: THE HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

**14 MAG  2546**

**DOC # 1**

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA             :

        - v. -                       :

WILLIAMS SCOTT & ASSOCIATES, LLC,    :
    a/k/a "WSA,"
    a/k/a "Warrant Services          :
     Association,"
JOHN TODD WILLIAMS,                  :
    a/k/a "JT,"
    a/k/a "Joe Steele,"              :
BENITA CANNEDY,
    a/k/a "Sharon Wright,"           :
RUDY JAMES,
    a/k/a "Ricky Kelly,"             :
    a/k/a "Robert French,"
ARTHUR COOK,                         :
    a/k/a "Ace Rogers,"
CHRISTOPHER LENYSZYN,                :
    a/k/a "Dan Miller,"
CLARK SMITH,                         :
    a/k/a "Mr. Cline," and
TITUS MCDOWELL,                      :
    a/k/a "Mr. McDowell,"
                                     :
        Defendants.
- - - - - - - - - - - - - - - - - - X

**SEALED**
**COMPLAINT**

Violation of 18 U.S.C. §
1349

COUNTIES OF OFFENSE:
NEW YORK, BRONX,
WESTCHESTER

SOUTHERN DISTRICT OF NEW YORK, ss.:

        BRIAN COMISKY, being duly sworn, deposes and says that
he is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

COUNT ONE
(Conspiracy to Commit Wire Fraud)

1.   From at least in or about 2009 up to and
including in or about May 2014, in the Southern District of New
York and elsewhere, WILLIAMS SCOTT & ASSOCIATES, LLC, a/k/a
"WSA," a/k/a "Warrant Services Association," JOHN TODD WILLIAMS,
a/k/a "JT," a/k/a "Joe Steele," BENITA CANNEDY, a/k/a "Sharon
Wright," RUDY JAMES, a/k/a "Ricky Kelly," a/k/a "Robert French,"
ARTHUR COOK, a/k/a "Ace Rogers," CHRISTOPHER LENYSZYN, a/k/a
"Dan Miller," CLARK SMITH, a/k/a "Mr. Cline," and TITUS
MCDOWELL, a/k/a "Mr. McDowell," the defendants, and others known
and unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with others to commit
offenses against the United States, to wit, to violate Section
1343 of Title 18, United States Code.

2.   It was a part and an object of the conspiracy
that WILLIAMS SCOTT & ASSOCIATES, LLC, a/k/a "WSA," a/k/a
"Warrant Services Association," JOHN TODD WILLIAMS, a/k/a "JT,"
a/k/a "Joe Steele," BENITA CANNEDY, a/k/a "Sharon Wright," RUDY
JAMES, a/k/a "Ricky Kelly," a/k/a "Robert French," ARTHUR COOK,
a/k/a "Ace Rogers," CHRISTOPHER LENYSZYN, a/k/a "Dan Miller,"
CLARK SMITH, a/k/a "Mr. Cline," and TITUS MCDOWELL, a/k/a "Mr.
McDowell," the defendants, and others known and unknown,
willfully and knowingly, having devised and intending to devise
a scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations and promises, would and did transmit and cause
to be transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343.

OVERT ACTS

3.   In furtherance of the conspiracy and to effect
the illegal objects thereof, the following overt acts, among
others, were committed in the Southern District of New York and
elsewhere:

a.   On or about February 28, 2014, CLARK SMITH,
a/k/a "Mr. Cline," the defendant, made false and fraudulent
representations over the telephone in an effort to trick a
victim into paying a purported debt.

2

b.   On or about May 19, 2014, CHRISTOPHER LENYSZYN, a/k/a "Dan Miller," the defendant, made false and fraudulent representations over the telephone in an effort to trick a victim into paying a purported debt.

c.   On or about May 20, 2014, ARTHUR COOK, a/k/a "Ace Rogers," the defendant, made false and fraudulent representations over the telephone in an effort to trick a victim into paying a purported debt.

d.   On or about May 21, 2014, BENITA CANNEDY, a/k/a "Sharon Wright," the defendant, made false and fraudulent representations over the telephone in an effort to trick a victim into paying a purported debt.

e.   On or about May 21, 2014, TITUS MCDOWELL, a/k/a "Mr. McDowell," the defendant, made false and fraudulent representations over the telephone in an effort to trick a victim into paying a purported debt.

f.   On or about May 22, 2014, RUDY JAMES, a/k/a "Ricky Kelly," a/k/a "Robert French," the defendant, made false and fraudulent representations over the telephone in an effort to trick a victim into paying a purported debt.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4.   I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter.  This affidavit is based upon my own observations, conversations with other law enforcement agents and others, and my examination of reports and records prepared by others.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview of the Scheme

5.   As set forth more fully below, JOHN TODD WILLIAMS, a/k/a "JT," a/k/a "Joe Steele," the defendant, owned and managed WILLIAMS SCOTT & ASSOCIATES, LLC, a/k/a "WSA," a/k/a "Warrant Services Association" (hereinafter, "WSA"), the

3

defendant, a debt collection company based in Norcross, Georgia. From at least in or about 2009 through in or about May 2014, employees working for WSA routinely tricked and coerced or attempted to trick and coerce thousands of victims throughout the United States into paying millions of dollars in consumer debts through a variety of false statements and false threats.

6.     In particular, in order to trick victims into paying purported debts, as well as fees to WSA, the defendant, employees of WSA, using a variety of aliases, told victims, among other things, that: (1) WSA had contracts with and/or was otherwise affiliated with certain federal or local law enforcement agencies, including the Department of Justice and the United States Marshals Service, as well as non-existent government agencies such as the "Federal Government Task Force" and the "DOJ Task Force"; (2) the consumers had committed criminal acts, such as "check fraud" or "depository check fraud," among other kinds of fraud, and if they did not pay the debt immediately, warrants would be issued for their arrest, at which point they would be arrested and jailed; (3) the consumers would have their drivers' licenses suspended if they did not pay their debts immediately; and (4) WSA was a law firm and/or that the employees were working with lawyers and a law firm.   In truth and in fact, these statements were false and fraudulent.

7.     In addition, to falsely create an appearance of legitimacy, and further trick their victims into making payments, employees of WSA, the defendant, routinely used legal terminology to invent legitimate-sounding, but completely bogus, explanations for the supposed imminent arrest of the victims, including for example, that the "statute of limitations" on the victims' "civil legal rights" had expired and therefore the matter was now a criminal matter that could be resolved only by payment of the debt or arrest.   Further, in addition to telling victims that the company was affiliated with the federal government, employees of WSA also at times prepared and sent correspondence to victims that made it appear falsely that WSA was affiliated with the federal government. For example, one document sent to a victim contained the seal of the United States Department of State and the following language immediately under the seal: "Warrant Services Association, A Division of the Federal Government Task Force."   Another document contained the company name "WSA, LLC" followed by the caption: "SERVING THE USDOJ FOR 15 YEAR [sic] STRONG."   At times, employees of WSA told victims that "WSA" stood for "Warrant Services Association."

4

8.    In total, from in or about 2009 through in or about April 2014, WSA, the defendant, collected approximately $4.1 million dollars from over 6,000 victims contacted in all 50 states.

9.    As part of the investigation, other law enforcement officers and I have, among other things: interviewed victims and reviewed hundreds of complaints filed by victims with the Federal Trade Commission ("FTC") and other agencies; recorded a phone conversation between an employee of WSA, the defendant, and a law enforcement officer posing as a consumer; and executed a search warrant at the office of WSA in Norcross, Georgia.  During the search of the WSA office, other agents and I recovered, among other things, multiple scripts containing false representations consistent with those described above, as well as thousands of recorded calls and messages between WSA employees and victims.  Summaries and excerpts of portions of several of those calls are set forth below in paragraphs 25 through 40.

### The Defendants

10.  WSA, the defendant, is a company that has been registered to do business in Georgia since at least 2000.  "John Williams" was listed as an officer and/or agent of WSA in 2000 and 2001, and then again in 2007 through April 11, 2013.  On or about April 19, 2013, "WSA, LLC" was registered with the Nevada Secretary of State with managing members "John Williams" and "Chris Lenyszyn."  Since at least 2009, WSA operated as a collection agency and employees working on behalf of the company attempted to collect actual or purported debts from victims nationwide using the misrepresentations described above.

11.  JOHN WILLIAMS, a/k/a "JT," a/k/a "Joe Steele," the defendant, was the owner and manager of WSA, the defendant.  In addition to running WSA, after that company was shut down in or about May 2014 after a search warrant was executed at the company's office, he started another debt collection company ("Collection Company-2") that purports to collect debts and employs many of the same misrepresentations used by WSA.

12.  BENITA CANNEDY, a/k/a "Sharon Wright," RUDY JAMES, a/k/a "Ricky Kelly," a/k/a "Robert French," ARTHUR COOK, a/k/a "Ace Rogers," CHRISTOPHER LENYSZYN, a/k/a "Dan Miller," CLARK SMITH, a/k/a "Mr. Cline," and TITUS MCDOWELL, a/k/a "Mr. McDowell," the defendants, were employees of WSA, the defendant. CANNEDY, JAMES, COOK, LENYSZYN, SMITH and MCDOWELL were debt collectors who made false threats and other misrepresentations

in an effort to convince victims to repay debts, and often times, significantly more money than the victims actually owed.

## Victim Complaints

13.   I have learned that there have been hundreds of complaints filed by victims with the FTC and other agencies concerning WSA, the defendant.  Based on my review of those complaints, I have learned that victims have received calls from individuals claiming to be from "Williams Scott and Associates" (among other similar names, such as "William Scott Associates"), who have stated, in substance and in part, and among other things, that:

a.    The caller worked for or was in contact with various law enforcement entities such as the Department of Justice, the United States Marshals Service, the sheriff, a "Federal Government Task Force," the FBI, and the "United States Task Force for the Department of Justice," among others; and

b.    The victims would be arrested if they did not call back and/or pay specified amounts immediately.

14.   I have also read reports of interviews of victims conducted by the FTC.  Based on my review of those reports, I have learned the following, in substance and in part:

a.    A victim ("Victim-1") stated that someone calling on behalf of WSA, the defendant, called several of Victim-1's family members asking for Victim-1 multiple times. During a conversation with Victim-1's son, the individual stated that there was a warrant out for Victim-1's arrest because he/she had committed fraud and owed them money.  Victim-1 called and asked "Marcus James," a representative of WSA, to send Victim-1 correspondence to confirm that WSA was a legitimate enterprise.  "James" told Victim-1 that if he/she did not comply with their demand to pay money back, Victim-1 would be subject to arrest and imprisonment.  Victim-1 was told that he/she would face federal officers and United States Marshals if Victim-1 did not comply with WSA's requests.

b.    Another victim ("Victim-2") stated that "Jan Smith" from WSA called Victim-2's home claiming to be investigating a check fraud case.  WSA represented themselves as an attorney's office that had close ties to a sheriff's office. "Smith" told Victim-2's spouse that the sheriff's office would be putting a warrant out for the spouse's arrest, which would result in jail time.  Victim-2 asked if he/she could fax

information showing that the check in question was not fraudulent. "Smith" responded that faxing the information would make no difference and stated that if Victim-2 did not pay over $2,000 immediately, Victim-2's spouse would be arrested.

        c.    Another victim ("Victim-3") stated that, beginning in or about June 2011, he/she began receiving telephone calls from WSA. Victim-3 was told that he/she owed $1,300 to two different creditors and that he/she had committed check fraud. The representative told Victim-3 that if he/she did not make payment arrangements that day, Victim-3 would be arrested. Victim-3 made a $500 payment over the phone. Over a year later, Victim-3 received another telephone call from WSA claiming that Victim-3 still owed money for the same loans Victim-3 was contacted about in 2011. The representative threatened that Victim-3 would be arrested if he/she failed to make a payment that day.

        d.    Another victim ("Victim-4") stated that Victim-4's father, brother, and sister-in-law received multiple telephone calls from WSA regarding a debt. In or about August 2012, Victim-4 called WSA and spoke with "Marcus James." "James" claimed that he worked for an attorney at WSA and told Victim-4 that he/she would be arrested if he/she did not pay his/her debt.

        e.    Another victim ("Victim-5") stated that he/she received a call from "Ricky Kelly," who claimed to work for an attorney, "William Scott." "Kelly" claimed that Victim-5's spouse would be arrested for fraud if they were unable to pay back a debt from a loan the spouse took out several years before. "Kelly" told Victim-5 that they would have to pay over $2,000 to ensure that Victim-5's spouse would not be arrested. "Kelly" told Victim-5 that he/she had fifteen minutes to make the decision or else the warrant for Victim-5's spouse's arrest would be processed immediately.

        15.    I have reviewed a summary of a complaint made by another victim ("Victim-6") who received a voicemail message from "Ricky Kelly" of WSA, the defendant. "Kelly" claimed, in substance and in part, that he was an investigator with the District Attorney's office and that he had contacted Green County in connection with bank fraud committed by Victim-6. Victim-6 was instructed to either contact WSA or surrender himself/herself. "Kelly" said that he was also working for stopfraud.gov.

16.   I have reviewed records maintained by another victim ("Victim-7"), as well as the summary of an interview with Victim-7.  Based on my review of those records and that information, I have learned the following, in substance and in part:

a.   In or about October 2013, Victim-7 received several calls and voicemails from "Jeffrey Williams," who claimed that he worked for the federal government and that he had a warrant for Victim-7's arrest due to a payday loan that Victim-7 had not repaid.  Victim-7 had in fact taken out a payday loan with a lender several years before that Victim-7 had not repaid.

b.   Victim-7 called the number provided by "Jeffrey Williams," and a woman answered on behalf of "Warrant Services Association."

c.   Victim-7 made a credit card payment in the amount of approximately $560.

d.   Victim-7 received a receipt via electronic mail from a third party payment processor (the "Payment Processor").  The receipt, with subject line "WSA, LLC Payment Confirmation," stated "Thank you for your payment to WSA, LLC."

e.   I have also reviewed a document emailed to Victim-7, bearing Victim-7's name, from "Warrant Services Association," dated the day of the receipt from the Payment Processor and listing the same amount paid as on the receipt. The document was emailed from the email account, "lscott@wsallc.net," and purports to copy "Jason.Rivers@usdjwarrantdivision.gov."  The body of the email lists the name "Larry Scott," and the title "Sr. Attorney, Warrant Services Association."  The attached document states, "ALLEGATIONS DISMISSED," and continues, "This documentation serves as confirmation that the above-mentioned account has been EXPUNGED with the County Processing Division."  At the top of the document is what appears to me to be the seal of the United States Department of State, under which is written: "Warrant Services Association, A Division of the Federal Government Task Force."  A copy of this letter is attached hereto as Exhibit A.

f.   I believe that the document described above in Paragraph 16.e was false and fraudulent, as it falsely indicated that WSA, the defendant, was associated with the federal government.  Moreover, based on my training and experience as a federal law enforcement officer, I am unaware of

any entity referred to as the "USDJ Warrant Division."  In addition, based on a review of a public database of domain name registration information, I am aware that there is no registration for the domain name "usdjwarrantdivision.gov."  I therefore believe that the email address listed above for "Jason Rivers" is fictitious.

17.  I have read a report prepared by an investigator who interviewed a victim who lives in New York, New York ("Victim-8"), and reviewed documents provided by Victim-8, and have learned the following, in substance and in part:

a.  Victim-8 obtained a $500 payday loan when he/she lived in Florida.  Victim-8 believed that the loan was repaid before he/she moved from Florida to New York, New York.

b.  In or about the Spring or Summer 2013, while living in New York, New York, Victim-8 received a telephone call from a female identifying herself as "Detective Smith" or "Detective White" who told Victim-8 that there was a warrant for Victim-8's arrest because of the unpaid payday loan.

c.  The "detective" explained to Victim-8 that he/she committed a "federal felony" because Victim-8 had closed his/her checking account and moved to a different state thereby preventing payment to be drawn on his/her account for the subject loan.  The "detective" demanded that Victim-8 pay the full amount and, if he/she did not, Victim-8 would be arrested and taken back to Florida.  The "detective" threatened to arrest Victim-8 at his/her home or work.  The "detective" said that the warrant would be cancelled if a payment was made.

d.  Victim-8 was called a second time by the "detective" and agreed to arrange payment.  Victim-8 was transferred to "Mr. Fritz" to set up a payment plan.  Victim-8 completed the payments and received a receipt from WSA, the defendant (listed as "WSA, LLC"), dated November 29, 2013, indicating a zero balance.  Victim-8 stated that he/she had made approximately $1,000 in payments for the original $500 loan.

e.  The receipt sent to Victim-8 was addressed to Victim-8 at an address in New York, New York.

### The Search of the WSA Office

18.  On or about May 29, 2014, other law enforcement agents and I executed a search warrant at an office belonging to WSA, the defendant, in Norcross, Georgia (the "Premises").

Among other documents that were recovered were numerous
documents that appear to be lists of employees and aliases.  The
documents contain tables with the following columns, among
others: "Employee Name" and "Dunning Name."[1]  Based on my review
of the employee lists, I have learned of the following "Dunning
Names" or aliases, among others, for employees of WSA:[2]

| Employee Name | Dunning Name |
| --- | --- |
| Arthur Cook | Inv. Ace Rogers |
| Benita Cannedy | Inv. Sharon Wright |
| Chris Lenyszyn | Dan Miller |
| Clark Smith | Mr. Cline |
| Rudy James | Ricky Kelly |
| Ty McDowell | Mr. McDowell |
| Todd(JT) | JT |

        19.   During the search of the Premises, law
enforcement agents also recovered numerous documents that appear
to be scripts for employees of WSA, the defendant, to use during
calls with victims (the "Scripts").  The Scripts contain
numerous misrepresentations, including threats of criminal
charges and/or arrests, and associations with the government
and/or attorneys.  For example, the Scripts include the
following:

        a.   "Failure to respond will lead to criminal
charges being pursued."

        b.   "This is investigator _____ I calling [sic]
in reference to a complaint that has been filed through the
national check fraud center were [sic] that stated that they
have sent correspondents [sic] to _____ as well _____ and
you have not responsed [sic] which has made your statue [sic] of
limitations for your civil legal rights exhaust.  That means
that you are being pursued for one count of theft by deception
and can be forwarded over to the local county for proceedings to
start."

        c.   "This message is for _____.  My name is
_____ from the investigation services of WSA.  Currently there
is a criminal complaint pending against you for theft of

---

[1] Based on my training, experience and familiarity with this
investigation, I am aware that "dunning" refers to the making of
repeated demands for the payment of a debt.
[2] Another name that appears, likely as an alias, on documents
recovered from the Premises, is "Jeffrey Williams."

services.  We are going ahead with legal proceedings today
therefore we do need to speak with you immediately.  Contact our
office as soon as possible at [a particular telephone number]
Ext ____.  Thank you.  Failure to respond will lead to criminal
charges persude [sic] against you being forwarded over to your
county."

        d.   "This is Tina Rogers, Sr. Paralegal w/ WSA.
We are contracted by the US Gov. . . . Criminal complaint has
been filed.  It's a Class A felony pending against you for theft
of Property/Serv./Deception.  If you would like to resolve this
matter B4 [before] we go ahead w/ the legal proceedings you may
do so today only."

        e.   "Hello, this is Mr. McDowell, Senior Claims
Coordinator certified with the Government Task Force.  Message
is solely intended for Mr/Mr. _____ regarding legal allegations
which require your statement on behalf of this matter . . . ."

        f.   "This is _____.  This call is in
regards to case # _____.  The US Dept. of Justice has
received notice from the National Crime Information Center to
issue an alert on a SSN ending in _____.  _____, of
_____ has 2 affidavits of fraud due to be expedited today as
a result of the statute of limitations expiring.  At 4pm eastern
time felony warrants will be activated and any existing drivers
liscense [sic] will be suspended effective immediately.  For an
opportunity to resolve this matter outside of court contact
Williams Scott Bureau of Investigations [phone number] ext 134."

        g.   "This message is for _____.  My name is
Jackie Atwater, Investigations Locator with the law firm of WSA.
This is a Class A misdemeanor pending against you for larceny of
property."

        h.   "Contracted through 46 states . . . .
Charges haven't been filed yet. . . . Generally, they do not
accept payment plans.  If you want to do payment plans you can
do so once you're on probation."

        20.  Among other documents recovered from the Premises
pursuant to the search warrant are numerous "Collector Payment
Forms" that list, among other information, the "Original Acct.
Balance" and "Overage Amount."  The forms also list "% of
Payment," which is listed at 30%, and "% of Overage," which is
listed at 40%.  Based in part on these documents, I believe that
employees of WSA, the defendant, were encouraged to misrepresent
the amount of money that debtors owed.  Employees were

compensated at 30% of the amount collected up to the actual
amount owed, and were paid 40% of any payment above the amount
that was actually owed.

21.   Certain of the Scripts that were recovered from
the Premises were found in an office that I believe belonged to
JOHN TODD WILLIAMS, a/k/a "JT," a/k/a "Joe Steele," the
defendant (the "JTW Office").[3]  Among the Scripts that were found
in the JTW Office, were the following, among others:

a.   A "Standard Message" script that states:
"This message is meant solely for (debtor's full name).  This is
Joe Steele calling from Williams, Scott & Assoc., I am calling
regarding your case which we are processing in our office, case
number_____.  Our law office will be making final
determination [sic] regarding your case, it is imperative that
you contact this law office to have any input regarding these
decisions. . . . It is imperative you contact this law office
within 24 hours."[4]

b.   A script that includes the following: "My
name is _____ with William, Scott & Associates.  Our
office facilitates legal complaints by locating individuals,
filing summons, requests for warrants and conducting background
checks. . . . [Our client has] asked us to investigate your
location and whereabouts for a summons on a lawsuit alleging a
check fraud and if necessary, request that a warrant be issued
against you in order to bring this matter before the courts."

_____

[3] Among other reasons that I believe that the office in which the
documents referenced in this paragraph were found belonged to
JOHN TODD WILLIAMS, a/k/a "JT," a/k/a "Joe Steele," the
defendant, are the nature of certain of the documents found.
For example, there are several printouts of email messages to
"John Williams" that have the name "John Williams" in bold at
the top.  Based on my experience, when emails are printed out
from Microsoft Outlook, the name of the email account from which
the email is printed is listed in bold at the top of the
printout.  I therefore believe that those documents, found in
the office, were printed out from WILLIAMS's email account.  In
addition, other documents found in the office include bankruptcy
documents for a bankruptcy proceeding titled, "In re Williams,
John T," numerous powers of attorney signed by "John Williams,"
and mail and other correspondence addressed to "John Williams."
[4] As described below, I am aware that "John Steele," is an alias
used by JOHN WILLIAMS, a/k/a "JT," a/k/a "Joe Steele," the
defendant.

      c.    A script listing the name "Joe Steele," and including the following instructions:

      i.    If the individual does not want to pay: "ARE YOU FIMILAR [sic] WITH THE LAW IN ___ COUNTY ABOUT WRITING A BAD CHECK ......... THEN GIVE THEM 48 HOURS TO PAY THEN SLAM THE PHONE IN THERE [sic] FACE!!!!" or "YOU SAY ... YOU GOT 48 HOURS TO PAY THE BILL AND WHEN YOU DON'T PAY WE PROCEED AGAINST YOU IMMEDIATELY ... THEN HANG UP!"

      ii.    "WHEN THEY'RE COOPERATING . . . THIS IS WERE [sic] YOU GET CREATIVE . . . LET THEM KNOW . . . WRITING A BAD CHECK IS A CRIME . . . ."

      iii.    "IF WE DON'T RECEIVE PAYMENT I WILL HAVE TO NOTE YOUR CASE AS A DIRECT REFUSAL TO PAY ON A JUST AND LEGAL DEBT. THEN FORWARD IT MY ATTY FOR IMMEDIATE ACTION . . ."

      d.    A handwritten script that says, at the top, "I don't want to put a lawsuit against you. Don't make me call my friends at the (FBI)."

      e.    An example "talk off" script that begins: "This is Joe Steele with Williams, Scott and Associates. I'm the Chief Investigator here in the Fraud Dept. . . . Do you know what the law is in your State regarding a bad Check. It's considered criminal."

      f.    A "power talk off script" that begins: "THIS IS JOE STEELE WITH THE LAW OFFICE WILLIAMS SCOTT & ASSOC, I'M ONE OF THE UNIT MANAGERS HERE, YOUR *** ___ HAS BEEN TRANSFERRED TO OUR OFFICE FOR IMMEDIATE PROCESS AND LITIGATION."

      g.    A handwritten script that provides: "My name is Mariea Mitchell, Litigation Specialist for WSA. I am calling in reference to an investigation of an [sic] criminal complaint that is pending against you. . . . Now let me give u your case number so once I transfer this call the investigator handling your case his name is Sr. Investorgator [sic] Ace Rogers . . . . Who are we? We are a government task force set up to investigate and collect info on individuals involved in Depository Account Fraud and theft by deception."[5]

---

[5] The script lists the name of a co-conspirator not named as a defendant herein, who, based on the employee lists referenced above, used the alias "Cathy Davis." "Mariea Mitchell" is a

        h.    Additional handwritten scripts that reference arrest warrants being issued.

        22.    In addition to the Scripts found in the JTW Office, other documents recovered from the JTW Office include the following, among others:

        a.    A document dated April 1, 2014 titled "Complaint Dismissed," sent to an individual indicating that he had paid $300. The document header includes the entity name "WSA, LLC" at an address in Texas with a certain telephone number ("Telephone Number-1"). Underneath the company name is the caption, "SERVING THE USDOJ FOR 15 YEAR [sic] STRONG," and above the company name is what appears to be the seal of the United States Department of State. A copy of this letter is attached hereto as Exhibit B.

        b.    A post-it note on which "W S A" is written with "Warrant Services Associations [sic]" written underneath.

        c.    A handwritten list of 27 phone numbers (some listed as "New," others listed as "Old") on a script for "WSA" (the "Listed WSA Phone Numbers"). I believe, based on my training, experience and familiarity with the investigation, that the reason that WSA, the defendant, used so many phone numbers was because of repeated publicized complaints by victims of the fraud.

        23.    I have reviewed records from a "Voice Over Internet Protocol" or "VOIP" service provider[6] (the "VOIP Provider") and have learned that as of February 2014, Telephone Number-1 and all but one of the Listed WSA Phone Numbers were assigned to an account subscribed to in the name "MR JOHN WILLIAMS, WSA LLC" (the "VOIP Account") and the listed address was the Premises. At that time, there were over 60 phone numbers associated with the VOIP Account.

---

"Dunning name" for a different individual on certain of the employee lists referenced above.

[6] Based on my training and experience, I am aware that VOIP is a technology through which voice and other communications can be transmitted over the internet. Essentially, VOIP service providers allow for telephone services to be provided through electronic hardware, such as computers, over the internet.

### The Recorded Calls with Victims

24.   In addition, law enforcement agents also recovered from the Premises electronic media that contained recordings of thousands of calls between victims and employees of WSA, the defendant (the "Recorded Phone Calls").   The recordings are stored as electronic files with file names that appear to me to contain the date and time of the recorded telephone call.   For example, I believe that a recording with the filename "OUT136-20140521-105718-1400684238.6662," is a recording of an outgoing telephone call that occurred at 10:57 a.m. on May 21, 2014.   As discussed more fully below, in reviewing certain of the Recorded Phone Calls, I have heard employees make many of the false and fraudulent representations discussed above.   Several of the recorded calls are described below.

### Benita Cannedy, a/k/a "Sharon Wright"

25.   Based on my review of certain of the Recorded Phone Calls, I have learned the following, in substance and in part:

a.   On or about May 21, 2014, at approximately 10:50 a.m., "Sharon Wright" called a victim ("Victim-9").   Based on my review of the recordings of the conversation (the conversation occurred in two parts after the initial call was disconnected), the following, in substance and in part, took place:

i.   The caller identified herself as "Chief Investigator Sharon Wright" and told Victim-9 that she was investigating a criminal complaint that had been forwarded against Victim-9.

ii.   "Wright" told Victim-9 that they "were in the process of proceeding against you legally," and that "prior to forwarding to your local authorities and in return them issuing a warrant for your arrest," "Wright" wanted to get a statement from Victim-9.

iii.   "Wright" told Victim-9 that she was collecting a payday loan that Victim-9 had previously obtained and that the current balance was $819.04.

iv.   When Victim-9 told "Wright" that Victim-9 was not working, "Wright" responded that she had no choice but to forward the case to Los Angeles County and that

15

Los Angeles County would issue a warrant for Victim-9's arrest for "depository check fraud" and "theft by deception."

v.      At one point, "Wright" put Victim-9 on hold so that she could "talk with the attorney." When she returned to the call, "Wright" said that if Victim-9 provided her checking information to "Wright," she would be able to hold "the driver's license suspension as well as the warrant."

vi.      When Victim-9 asked whether she could make a payment at Los Angeles County, "Wright" said that once the case gets forwarded to Los Angeles County, all they will do is issue a warrant for Victim-9's arrest. "Wright" then said that if Victim-9 wanted to "rectify" the situation on a voluntary basis, then Victim-9 should pay "us." If it was not taken care of voluntarily, however, the case would be forwarded to Los Angeles County at which point Victim-9 would have to "turn [herself] in."

vii.      Victim-9 then told "Wright" that she was going through the bankruptcy process, and "Wright" responded that bankruptcy would not cover the "legal aspects" of the amount owed.

viii.      When Victim-9 asked for customer service, "Wright" responded: "Customer service? Ma'am you're on the way to jail." Victim-9 asked to see information to ensure that everything was legitimate, and "Wright" responded, "Don't take care of it, and you'll see just how legit it is." Victim-9 then said that she wanted to take care of the debt and that she was eight months pregnant and did not want to go to jail. "Wright" then responded, "I'm not going to go back and forth. I wouldn't care if you were nine months pregnant. I have a job to do here."

ix.      "Wright" told Victim-9 that "Wright" would have information sent by electronic mail and that Victim-9 would then have two hours to call back, and that if Victim-9 did not call back in two hours, the attorney would then forward the case to Los Angeles County for an arrest warrant to be issued.

26.      Another law enforcement agent and I have interviewed BENITA CANNEDY, a/k/a "Sharon Wright," the defendant. During the interview, CANNEDY stated that she used the name "Sharon Wright" while working at WSA, the defendant. CANNEDY also stated, in substance and in part, that if debtors claimed that CANNEDY stated that she had a warrant against them, then the debtors were lying.

16

27.   Based on my interview with BENITA CANNEDY, a/k/a "Sharon Wright," the defendant, I have become familiar with CANNEDY's voice and it appears to me that the voice on the recorded telephone conversation discussed in paragraph 25.a is CANNEDY's.

**Rudy James, a/k/a "Ricky Kelly," a/k/a "Robert French"**

28.   Based on my review of certain of the Recorded Phone Calls, I have learned the following, in substance and in part:

a.   On or about May 22, 2014, at approximately 6:04 p.m., "Mr. French" received a call from a victim ("Victim-10").  Based on my review of the recordings of the conversation (the conversation occurred in two parts after the initial call was disconnected), the following, in substance and in part, took place:

i.   "Mr. French" told Victim-10 that he had "a restitution" of $2,549.40.  When Victim-10 told "Mr. French" that Victim-10 thought he had paid the debt with a credit card, "Mr. French" told, Victim-10 that, "when you file for an ADR, you can't use a debt instrument to pay a debt."  "Mr. French" went on to explain that "we have to file for an Alternative Dispute Resolution," at which point all other creditors will be "closed out."

ii.   Victim-10 told "Mr. French" that he had checked and had a zero balance.  "Mr. French" told him that he still had to write a check.  Victim-10 asked whether he should contact an attorney because he could not afford to go to jail and "Mr. French" told Victim-10 that Victim-10 did not need an attorney unless the attorney was going to pay the debt for him.

iii.   "Mr. French" told Victim-10 that there was between 200% and 400% interest on his debt and that there was a "statute of limitations" on everything.

iv.   When Victim-10 told "Mr. French" that he did not have enough money to pay immediately, and was only asking for documentation of the debt, "Mr. French" told Victim-10 that sending the documentation would not stop the warrant from being processed.  "Mr. French" said that once he hung up the phone, he would put the case into "refusal status."  "Mr. French" said that has going to forward the case and that Victim-10 should have his attorney contact the office to set up an

17

arraignment. "Mr. French" told Victim-10 that he was going to have to send out the case for an arrest warrant.

29.   Another law enforcement agent and I have interviewed RUDY JAMES, "Ricky Kelly," a/k/a "Robert French," the defendant. During the interview, JAMES stated, in substance and in part:

a.   JAMES used the aliases "Frank O'Brien" and "Rob French" while working at WSA, the defendant.

b.   JAMES told debtors that he was a paralegal or investigator.

c.   JAMES used "scare tactics," including threats of arrest, in order to collect debts, even though he knew that the threats were unsubstantiated and were wrong.

d.   JAMES also said that he had sent a letter to debtors that purported to be on government letterhead.

e.   JAMES was working as a debt collector at Collection Company-2.

30.   Based on my interview with RUDY JAMES, "Ricky Kelly," a/k/a "Robert French," the defendant, I have become familiar with JAMES's voice and it appears to me that the voice on the recorded telephone conversation discussed in paragraph 28.a is JAMES's.

### Arthur Cook, a/k/a "Ace Rogers"

31.   I have listened to a voicemail left for another victim ("Victim-11") from "Senior Investigator Rogers," on or about April 10, 2012. In that voicemail message, "Senior Investigator Rogers" stated, in substance and in part, that:

a.   He was certified by the "United States Governmental Task Force," and that Victim-11's file had been forwarded to him regarding "theft by deception" allegations.

b.   He and "Attorney Scott" were prepared to "sign off" on Victim-11's file and "get it over to Harris County" to "have you picked up."

32.   Based on my review of certain of the Recorded Phone Calls, I have learned the following, in substance and in part:

18

a.     On or about May 20, 2014, at approximately
11:10 a.m., "Ace Rogers" received a telephone call from a victim
("Victim-12").  Based on my review of the recording of the
conversation, the following, in substance and in part, took
place:

i.     "Rogers" introduced himself as "Senior
Investigator Ace Rogers, head of the Fraud Division."

ii.     "Rogers" stated that "any case that I
work has to be forwarded over to the local county on that day"
and an arrest warrant would then be issued with a judge's
consent.

iii.     Victim-12 provided her husband's name
and "Rogers" stated that Victim-12's husband was being pursued
for a "theft by receiving" charge to be forwarded to the local
county and processed for a warrant.  If her husband was
"detained by county sheriffs, he would have to sit in
reformatory" until he was tried.

iv.     "Rogers" referred to notes from a
"paralegal" and indicated that the "statute of limitations" had
expired for Victim-12's husband's "civil legal rights."

v.     "Rogers" told Victim-12 that, in the
State of Texas, anything over $1,000 after the statute of
limitations expired was a criminal offense.

vi.     Victim-12 told "Rogers" that they had
retained an attorney and were in the process of filing for
bankruptcy.  "Rogers" told Victim-12 that the "worst case
scenario" was that they would seek garnishment of wages but that
the "attorney thing" would not work now.  When Victim-12 told
"Rogers" that he was trying to scare them, "Rogers" told Victim-
12 that her husband would need a criminal attorney.

b.     On or about May 22, 2014, at approximately
3:20 p.m., "Ace Rogers" received a telephone call from a victim
("Victim-13").  Based on my review of the recording of the
conversation, the following, in substance and in part, took
place:

i.     "Rogers" introduced himself as "Senior
Investigator Ace Rogers, head of the Fraud Division."

19

ii.     "Rogers" referred to notes from a "paralegal" and indicated that the "statute of limitations" had expired for his "civil legal rights" on what was a civil matter.

iii.     "Rogers" indicated that Victim-13's case was to be forwarded "today" for a possible warrant for Victim-13's arrest.

iv.     "Restitution" was the only thing that could prevent the case from being forwarded to a judge to sign off on the warrant.

v.     "Rogers" stated that anything over $1,000 in the State of California was a criminal offense, and that Victim-13 owed $1,857.12. "Rogers" stated that the amount was due to interest, late fees, "statute of limitations fees," and attorney fees.

vi.     "Rogers" stated that the notations from the paralegal indicate that Victim-13's bank account was closed. Because the bank account was closed, "that's when your statute of limitations kicked into effect. . . . That's illegal."

vii.     "Rogers" stated that, generally, cases were only in the office for eight hours before a judge signs off on the warrant to "present you for the county sheriffs."

viii.     When Victim-13 stated that she was only able to afford a $25 monthly payment, "Rogers" stated that "this isn't a collection matter. . . . You're dealing with charges." Victim-13 then stated that she did not have more money and "Rogers" told Victim-13 to pull her driver's license out and that it would then be flagged for suspension.

ix.     "Rogers" told Victim-13 that her warrant could be "not only for home, school or work, but they also can proceed to give you 90 days to six months in a county facility."

33.     Another law enforcement agent and I have interviewed ARTHUR COOK, a/k/a "Ace Rogers," the defendant. During the interview, COOK stated the following, in substance and in part:

a.     COOK used the name "Senior Investigator Rogers" while working at WSA, the defendant.

b.      COOK did not tell debtors that they were going to jail or had a warrant for not paying their debt.

c.      COOK told debtors that their debt would be turned over to the county which would increase the debt.   COOK would say that once the debt was forwarded to the court, that it was in the judge's hands.

d.      COOK was unaware of any debt that was ever turned over to the courts.

e.      COOK read on the internet that WSA was a fraud.

34.   Based on my interview with ARTHUR COOK, a/k/a "Ace Rogers," the defendant, I have become familiar with COOK's voice and it appears to me that the voice on the recorded voicemail and telephone conversations discussed in paragraphs 31, 32.a, and 32.b is COOK's.

**Christopher Lenyszyn, a/k/a "Dan Miller"**

35.   Based on my review of certain of the Recorded Phone Calls, I have learned the following, in substance and in part:

a.      On or about May 19, 2014, at approximately 9:04 p.m., "Dan Miller" received a telephone call from a victim ("Victim-14").   Based on my review of the recording of the conversation, the following, in substance and in part, took place:

i.      "Miller" told Victim-14 that he was an investigator for "WSA" and was investigating "theft of services."   "Miller" explained that "what we do is we issue warrants and we do the suspension of driver's license over here."

ii.      Victim-14 told "Miller" about a previous call that he had received that he believed was a scam, but because when "you called me and I heard . . . you could put out a warrant . . . then I realized it was the real thing."

iii.      "Miller" told Victim-14 that the total amount owed was $1,155.66 and that Victim-14 needed to make a 50% down payment.

iv.     Victim-14 then asked whether, if he was unable to pay the 50% that night, he would have an arrest warrant issued for him the next day.  "Miller" responded that it could be a suspension of Victim-14's driver's license or a warrant and that "you don't want any surprises either at the house or work, especially when it comes to that, your business your family and all that."

v.     "Miller" said that "it's not a scam. They're for real."

vi.     When Victim-14 asked if he could have more time, "Miller" told Victim-14 that "she" had court in the morning and so "Miller" could buy some time until the following day after "she" returned from court.  "Miller" then told Victim-14 that he worked "attorney hours," namely 9:00 a.m. to 5:00 p.m.

b.     On or about May 28, 2014, at approximately 2:41 p.m., "Dan Miller" received a telephone call from a victim ("Victim-15").  Based on my review of the recording of the conversation, the following, in substance and in part, took place:

i.     Victim-15 said that she had received a call about something "criminal."  "Miller" said that his name was "Dan Miller," and that he was an investigator with "WSA, Warrant Services Association."  "Miller" said that he was investigating a claim of fraud and that prior to forwarding the case to the local authorities in San Diego County he wanted to get a statement from Victim-15.

ii.     "Miller" claimed that "they're saying it's theft by deception and they've got everything they need on you to go ahead and pursue criminal charges."  "Miller" said he was calling to find out whether Victim-15 was going to handle the matter on a voluntary basis "otherwise we will go ahead and do the suspension of driver's license and/or the warrant."

iii.     "Miller" said that the amount owed was $1,777.69 and that "they" had everything they needed to prosecute: a camera, Victim-15's driver's license, social security number, and the amount of money Victim-15 took out. "Miller" said that the original holder of the debt had sent the debt to two debt collection agencies who were unable to collect, and so they sent it to the attorneys and would prosecute through "us."

22

iv.     When Victim-15 said that she did not remember incurring a debt that large, "Miller" stated he was just going to process the warrant "and then they'll pick you up and then you can deal with the judge, and then bail yourself out and get an attorney."  "Miller" said that with court fees and attorney fees, the amount owed would be about $3,500.

v.     "Miller" told Victim-15 that the "attorney" was currently in court.  "Miller" then told Victim-15 that she would need to call "Miller" back in order to stop the warrant or driver's license suspension.  "Miller" stated that he could only "hold it" for the next two hours.

vi.     Victim-15 said that she did not have the money to make a 50% down payment and that "I guess, if I have to go to jail because I have nothing," then that is what she would do.  "Miller" then responded, "that's your choice."

vii.     "Miller" put Victim-15 on hold at which point an individual who I believe to be BENITA CANNEDY, a/k/a "Sharon Wright," the defendant, got on the phone and introduced herself as "Chief Investigator Sharon Wright."  CANNEDY told Victim-15 that once Victim-15 had a warrant she had to turn herself in.

viii.     CANNEDY told Victim-15 that CANNEDY would consult with an attorney to see if she could reduce the amount Victim-15 had to pay.  CANNEDY claimed that the amount had increased because of late fees, interest and legal fees.

ix.     CANNEDY told Victim-15 to speak with family and friends about getting the money and "that way you'll hold yourself from going to jail."  CANNEDY then asked: "Where's your mom?  Where's mom and dad? . . . You're facing five years imprisonment on these charges."

36.     I have spoken with CHRISTOPHER LENYSZYN, a/k/a "Dan Miller," the defendant.  Based on my conversation with LENYSZYN, it appears to me that the voice on the recorded telephone conversations discussed in paragraphs 35.a and 35.b is LENYSZYN's.

**Clark Smith, a/k/a "Mr. Cline"**

37.     I have listened to a recording of a telephone call made by an undercover investigator (the "UC") to a telephone number associated with WSA, the defendant, on or about February 28, 2014, from an undercover telephone number.  At the

beginning of the call, an automated message states, in part: "Thank you for calling WSA. If you know your party's extension, please dial it now. If you received a summons telling you to appear in court, press 1. For the fraud department, press 2. For the processing division, press 3." After the UC pressed "2," an individual claiming to be "Mr. Cline" answered the phone. During the ensuing conversation between the UC and "Cline," the following took place, in substance and in part:

a. The UC, initially using the name "Anthony Lowe," claimed that he had received a message that he was in trouble.

b. "Cline" stated that he worked for WSA, which stood for "Warrant Services Association." When the UC asked if that meant that he owed money, "Cline" claimed that "restitution" may be necessary to avoid any "further legal action."

c. When the UC said that he was reluctant to provide information, "Cline" stated that "if it is regarding you, you probably would want to know, if a warrant could come out to you or not. . . . If you have an opportunity to take care of restitution or resolve the issue then surely you have . . . you would be able to do so. If not, then of course a warrant comes out for arrest for that person."

d. "Cline" said that WSA facilitates warrants for 50 states and is contracted through the federal government.

e. When the UC asked what would happen if the UC did not pay, "Cline" responded that they have attorneys who forward information to local district attorney's offices who then present probable cause to a judge to obtain an arrest warrant. "Cline" stated that WSA was providing an opportunity and a "way out."

f. "Cline" looked up the name "Anthony Lowe" in WSA's computer system to determine whether they had records for that person. When the name was not in the system, "Cline" said that "Lowe" had "more than likely" received a call for one of "Lowe's" family members, because WSA tries to find people in their system through their family and friends.

38. I have telephonically interviewed CLARK SMITH, a/k/a "Mr. Cline." During the interview, SMITH stated the following, in substance and in part:

24

a.     SMITH used the name "Mr. Cline" while working at WSA, the defendant.

b.     SMITH did not tell debtors that they would be arrested; only that that the debt would go to the courts to decide.  SMITH heard other collectors say that there was a possibility that the debtors could go to jail.

c.     SMITH told debtors in Texas that they were committing check and depository fraud but did not know if the debtor had actually been accused of fraud based on the information that had been provided him.

d.     SMITH said that he absolutely did not tell debtors that he worked for or with the federal government. SMITH did not think that WSA had a contract with the federal government and did not tell debtors that WSA had such a contract.

e.     SMITH did not tell debtors that they had warrants against them.

f.     SMITH never heard of any debtor being arrested for not paying WSA, nor was SMITH aware of any debtor that was referred to the courts and subsequently arrested.

g.     WSA was not in the business of serving warrants.  SMITH only told debtors of the civil consequences of not paying a debt.

h.     SMITH did not tell debtors that "WSA" was an acronym for anything and, in particular, never told debtors that "WSA" stood for "Warrant Services Association," because SMITH was not a police officer.

39.     Based on my interview with CLARK SMITH, a/k/a "Mr. Cline," the defendant, I have become familiar with SMITH's voice and it appears to me that the voice on the recorded telephone conversation discussed in paragraph 37 is SMITH's.

**Titus McDowell, a/k/a "Mr. McDowell"**

40.     Based on my review of certain of the Recorded Phone Calls, I have learned the following, in substance and in part:

a.     On or about May 21, 2014, at approximately 1:29 p.m., "Mr. McDowell" received a telephone call from a

25

victim ("Victim-16").  Based on my review of the recording of
the conversation, the following, in substance and in part, took
place:

     i.  Victim-16 told "Mr. McDowell" that she
was returning a call referencing "fraud."  "Mr. McDowell" told
Victim-16 that he was investigating one count of collateral
theft and was seeking some form of mediation for full
restitution before forwarding the case to Davison County.  "Mr.
McDowell" told Victim-16 that the "full restitution" amount was
$1,124.18.

     ii.  "Mr. McDowell" told Victim-16 that the
only way to stop the process was "to secure this matter for the
full restitution . . . . [A]t that time, they'll file an ADR
through the clerk's office to close out your file to ensure that
this doesn't reflect against your credit report or your criminal
record."

     iii.  Victim-16 told "Mr. McDowell" that she
wanted to resolve the situation but that she did not currently
have a job and was being taken care of by her daughter because
she was having hip replacement surgery the following week.

     iv.  "Mr. McDowell" said that he was going
to speak with the attorneys but that they could not hold the
case in their office for over 48 hours because the "civil legal
rights" had been "exhausted."  "Mr. McDowell" said that they try
to mediate, because if they move forward they "start the process
against you," which would "reflect your license in the meantime
until you are rendered with a court case . . . ."  He then said
that the attorneys just want the money "or either they're going
to proceed against you criminally. . . . Simple as that."  He
suggested that Victim-16's daughter help, because "they are
going to process this matter through the county, they will
temporarily suspend your license."

     v.  "Mr. McDowell" told Victim-16 that most
of the money owed was interest, legal fees, late fees and clerk
fees.

     vi.  "Mr. McDowell" asked Victim-16 whether
her daughter wanted to see her incarcerated.  He told Victim-16
that they were not a collection agency.

     b.  On or about May 21, 2014, at approximately
4:21 p.m., "Mr. McDowell" placed a telephone call to a victim
("Victim-17").  Based on my review of the recording of the

conversation, the following, in substance and in part, took place:

       i.    "Mr. McDowell" told Victim-17 that his name was "Mr. McDowell" with the mediation department of WSA and that he was investigating an affidavit of fraud.

      ii.    Victim-17 told "Mr. McDowell" that she had been a victim of identity theft. "Mr. McDowell" said that Victim-17 had 48 hours to comply regarding the $1,996.66 in restitution.

     iii.    When Victim-17 asked whether she was being charged in the affidavit of fraud, "Mr. McDowell" responded: "Yes, ma'am, because it's rendered against your information," and then clarified that the charge is "check fraud."

     iv.    "Mr. McDowell" said that the lender "wants restitution for the full balance through the criminal courts." He then said that the bank laws have been violated, and cited: "Section 35, Title 43" of the "US bank laws."[7]

      c.    On or about May 22, 2014, at approximately 11:49 a.m., "Mr. McDowell" left a voicemail for a victim ("Victim-18") in which he stated, in substance and in part, that if Victim-18 did not provide payment information, "Mr. McDowell" would request that "the fullest extent be proceeded for one count of depository account fraud, as well as one count of theft by service. This matter will be forwarded immediately through your county, and which, at that time, they will request that a judge signs off immediate action to proceed against your license and your social."

    41.    Another law enforcement agent and I have interviewed TITUS MCDOWELL, a/k/a "Mr. McDowell," the defendant. During the interview, MCDOWELL stated the following, in substance and in part:

      a.    Unlike other collectors, MCDOWELL used his real name while collecting debts on behalf of WSA, the defendant.

---

[7] I am aware that Title 43, United States Code, Section 35 is titled: "Federal Land Policy and Management."

        b.    MCDOWELL stated that he always followed the FDCPA Guidelines.[8]

        c.    MCDOWELL said that he never told any debtors that they would be arrested if they failed to pay their debt although he claimed to have heard other collectors threating debtors with arrest.

        d.    WSA changed its telephone number every two to three months because of bad business reviews on the internet.

    42.    Based on my interview with TITUS MCDOWELL, a/k/a "Mr. McDowell," the defendant, I have become familiar with MCDOWELL's voice and it appears to me that the voice on the recorded voicemail and telephone conversations discussed in paragraphs 40.a, 40.b and 40.c is MCDOWELL's.

### WSA & Collection Company-2

    43.    I have reviewed records filed with the Georgia Secretary of State for "Williams, Scott & Associates, LLC," and have learned that "John Williams" was listed as the manager of WSA, the defendant, in the company's initial registration on or about November 22, 2000. In subsequent filings, "John Williams" was also listed as CFO and agent of the company. "John Williams" was removed as a "partner" of WSA on or about April 11, 2013.

    44.    I have reviewed records filed with the Nevada Secretary of State, and have learned that on or about April 19, 2013, a registration was filed for "WSA, LLC," listing "John Williams" and "Chris Lenyszyn" as managing members of the company. "Chris Lenyszyn" has since been removed as a managing member of the company.

---

[8] I am aware that FDCPA stands for the Fair Debt Collection Practices Act. I am also aware that the FDCPA prohibits debt collectors from using any false or misleading representations in connection with the collection of any debt, including: "the false representation of the character, amount, or legal status of any debt; or . . . [t]he representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action[; or] [t]he threat to take any action that cannot legally be taken or that is not intended to be taken." 15 U.S.C. §§ 1692e(2)(A), (4), (5).

45.   I have conducted a search on the State Bar of Georgia website and have determined that neither JOHN TODD WILLIAMS, a/k/a "JT," a/k/a "Joe Steele," nor CHRISTOPHER LENYSZYN, a/k/a "Dan Miller," the defendants, are or ever were registered attorneys in the State of Georgia.

46.   I have conducted a search on the State Bar of Nevada website and have determined that neither JOHN TODD WILLIAMS, a/k/a "JT," a/k/a "Joe Steele," nor CHRISTOPHER LENYSZYN, a/k/a "Dan Miller," the defendants, are or ever were registered attorneys in the State of Nevada.   In addition, neither "Williams Scott" nor "WSA" were listed as law firms in the State of Nevada.

47.   I have reviewed bank records maintained by a bank ("Bank-1")  and have learned the following:

a.   There are three accounts in the name "WSA Williams Scott & Associates";

b.   "John T. Williams," with the same date of birth as JOHN TODD WILLIAMS, a/k/a "JT," a/k/a "Joe Steele," the defendant, is listed as a signatory for all of the accounts;

c.   The accounts receive deposits from at least one credit card payment processor.  Based on my training and experience and familiarity with the investigation, I believe these deposits are for credit card payments made by victims of the fraud;

d.   There appear to be no payments to or from the federal government consistent with a contract with the federal government;

e.   I have reviewed surveillance videos of transactions for a "WSA Williams Scott & Associates" bank account.  The individual in the surveillance videos appears to me to be the same person depicted in a photograph of JOHN TODD WILLIAMS, a/k/a "JT," a/k/a "Joe Steele," the defendant, that is maintained by the Georgia Department of Motor Vehicles.

48.   I have reviewed bank records maintained by a credit card processor listed on the Bank-1 account statements (the "Credit Card Processor") and have learned the following, in substance and in part:

a.   There are two accounts with the Credit Card Processor opened by "John Williams."  The first account ("CC

29

Account-1") was opened in or about September 2009 and was closed in or about February 2011.  The merchant name for CC Account-1 is "Williams Scott and Associates," and "John Williams" is listed as the CEO.  The second account ("CC Account-2") was opened in or about October 2009.[9]   The merchant name for CC Account-2 is "Williams Scott and Associates LLC," and "John Williams" is listed as the CEO.  According to the account statements for CC Account-2, in or about May 2013, the DBA ("doing business as") name switched from "Williams Scott and Associates LLC" to "WSA LLC."

b.   Between January 2010 and March 2014, the total credit card revenue reported on the account statements for CC Account-1 and CC Account-2 was over $4.1 million.

49.   I have reviewed records maintained by a company that provides debt purchasing and servicing services and have learned, in substance and in part, that WSA, the defendant, began purchasing debt from the company as early as March 2009.

50.   I have read a declaration prepared by an investigator for the Georgia Governor's Office of Consumer Protection (the "Investigator") and spoken with another law enforcement agent with the FBI ("Agent-1") who spoke with the Investigator.  Based on my review of that report and my conversation with Agent-1, I have learned the following, in substance and in part:

a.   In or about November 2012, the Investigator attempted to serve a Civil Investigative Demand ("CID") on JOHN TODD WILLIAMS, a/k/a "JT," a/k/a "Joe Steele," the defendant, at his residence ("Address-1") for records relating to WSA, the defendant.  At Address-1, the Investigator observed a man drive up to the residence, who, based on law enforcement and driver's license photographs, appeared to be WILLIAMS.  The Investigator told the man that he was there to serve a CID, and the individual denied that he was WILLIAMS but was instead "Joe Steele."  The man claimed that he did not have any identification.

b.   On or about December 5, 2012, the Investigator attended a meeting between WILLIAMS and WILLIAMS's probation officer.  The Investigator recognized WILLIAMS as the individual on whom he had attempted to serve a CID at Address-1 and who had identified himself as "Joe Steele."  The

---

[9] I have learned that, as of April 4, 2014, CC Account-2 was closed by the Credit Card Processor.

Investigator then served the CID on WILLIAMS, to which WILLIAMS did not respond.

           c.   On or about April 23, 2013, the Investigator attempted to serve a notice of failure to respond on WILLIAMS at Address-1.  WILLIAMS claimed that he was no longer a manager or owner of WSA.

       51.   I have reviewed records from the Payment Processor and have learned that individuals who have paid or have attempted to pay money to WSA, the defendant, reside in all 50 states and, among other places, New York, New York, the Bronx, New York and Westchester County, New York.  Those records also show that between in or about October 2009 through in or about April 2014, there have been over 6,000 customers of WSA.

       52.   I have reviewed complaints filed by victims with the FTC and other agencies concerning Collection Company-2. Based on my review of those complaints, I have learned that victims have received calls from individuals claiming to be from Collection Company-2 who are using many of the same threats and misrepresentations discussed above in order to collect debts.

       53.   I have reviewed records filed with the California Secretary of State, and have learned that on or about July 31, 2014, a registration was filed for Collection Company-2 listing an individual with the last name "Williams" as an agent for service of process.

       54.   During the search of the Premises, a document was recovered from the JTW Office with the heading "New LLC's." Among the names of companies listed on the document were "WSA Williams Scott & Assoc LLC" and a company name similar to the company name of Collection Company-2.

       55.   WHEREFORE, I respectfully request that arrest warrants be issued for JOHN TODD WILLIAMS, a/k/a "JT," a/k/a "Joe Steele," BENITA CANNEDY, a/k/a "Sharon Wright," RUDY JAMES, a/k/a "Ricky Kelly," a/k/a "Robert French," ARTHUR COOK, a/k/a "Ace Rogers," CHRISTOPHER LENYSZYN, a/k/a "Dan Miller," CLARK SMITH, a/k/a "Mr. Cline," and TITUS MCDOWELL, a/k/a "Mr.

McDowell," the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

_____
BRIAN COMISKY
Special Agent
Federal Bureau of Investigation

Sworn to before me this
12th day of November, 2014

_____
THE HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

32

# EXHIBIT A



Phone:  970-497-4607
Fax:    970-691-6460

**WARRANT SERVICES ASSOCIATION**
A DIVISION OF THE FEDERAL GOVERNMENT TASK FORCE

PO Box 921041

Grand Junction, CO 81505

**RESTITUITION PAID IN FULL**

| | | | |
|---|---|---|---|
| **Date of Notice:** | 10/10/2013 | **Description:** | USDJ, ▮▮▮ F.C.C.C. |
| **Criminal Complaint #:** | AC5171390-0504 | **Client Account:** | 4874030 |
| **Account Opened:** | 04/09/2010 | **Process Type:** | **Bad Cheque Issuance** |
| **Bank:** | | **Case:** | **Nole Prosequi (Closed)** |
| **Amount Paid:** | $559.02 | **SS#:** | |
| | | **County:** | |

# ALLEGATIONS DISMISSED

This documentation serves as confirmation that the above-mentioned account has been **EXPUNGED** with the County Processing Division. Also, Warrant Services Associations will mail you a release document that includes all evidence to the above mentioned address within 15-30 business days.

The above mentioned account holder is relieved and has no further obligation to the above notated account or governing authorities.

No further action is necessary.  Please be sure to maintain a copy of this documentation for your personal records.

**WARRANT SERVICES ASSOCIATION**
Corporate Processing Division
Grand Junction, CO 81505

*"This document has been approved by all legal parties involved."*

# EXHIBIT B



**WSA, LLC**
SERVING THE USDOJ FOR 15 YEAR STRONG
PO BOX 14867
ABILENE, TX 79601

Phone:   325-803-2399
Fax:     325-442-3388

**AMOUNT PAID:**   **$300.00**

| | |
|---|---|
| **Date of Notice:** | 4/1/14 |
| **File Number:** | ALL3398494-7987 |
| **Reason Code:** | Theft of Services |
| **Bank:** | |
| **Charge:** | **Bad Cheque Issuance/Chck #1147** |

**Description:**
**Client Account:**
**SSN:**
**Date of Birth:**
**Complaint Status:**   **EXPUNGED**

## COMPLAINT DISMISSED

This documentation serves as confirmation that the above-mentioned account has been **RECTIFIED** with the County Processing Division. The payment of **($300.00)** has been received and posted. The necessary documents will be forwarded to the original creditor to ensure the proper update of all three major credit-reporting agencies.

### Please allow 30 to 45 days for completion.

At this time, no action is deemed necessary. If you require further assistance, please contact your case manager Sr. Liaison Jeffrey Williams at 325-603-2399 @ ext. 116. Please be sure to maintain a copy of this document for your personal records.

**WSA, LLC**
COUNTY PROCESSING DIVISION
ABILENE, TX 79601

*This communication is legal and binding and requires immediate attention. Further action will be enforced if ignored. This document has also been approved by all parties involved.*